**Ronald R. LAWRENZ, Jr., Plaintiff,**

v.

**Roderick L. JAMES, individually, and Harry K. Singletary, Jr., as Secretary of the State of Florida Department of Corrections, Defendants.**

**No. 93–254–CIV–FtM–23.**

United States District Court,
M.D. Florida.

April 6, 1994.

Stanley Edward Marable, Sarasota, FL, for plaintiff.

Frank Edward Brown, Albert J. Bowden, III, Atty. General's Office, Dept. of Legal Affairs, Tallahassee, FL, for defendants.

## OPINION AND ORDER

GAGLIARDI, Senior District Judge.

Plaintiff Ronald R. Lawrenz, Jr. ("Plaintiff") claims in this action under section 1983 of Title 42, United States Code, 42 U.S.C. § 1983 (1981 & Supp.1993) (§ 1983"), that Defendant Roderick L. James ("Defendant James"), superintendent of Charlotte Correction Institution ("CCI") during the relevant time period, and Defendant Harry K. Singletary, Jr. ("Defendant Singletary"), Secretary of the State of Florida Department of Corrections ("DOC"), violated his First Amendment rights of free speech and association. Defendant James moves for summary judgment on qualified immunity grounds pursuant to Rule 56 of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 56 (West 1994) ("Rule 56"). Though not clearly articulated at a status on this case on March 28, 1994 ("March 28 Status"), a review of a transcript

of that proceeding indicates that Defendants James and Singletary also move for summary judgment on the merits, arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Plaintiff moves for partial summary judgment pursuant to Rule 56 on the issue of whether Defendants' decision to terminate him was substantially motivated by Plaintiff's involvement in an incident that occurred on January 18, 1993, *see* Part I, *infra.*

At the March 28 Status, the parties stipulated to most of the relevant, controlling facts in this case. The parties also agreed that there were no factual issues for a jury to consider and that the case was an appropriate one for the Court to decide on its legal merits. Also, by focusing exclusively on his freedom of speech claim, Plaintiff apparently abandoned his freedom of association argument. Finally, Plaintiff conceded that his claim against Defendant Singletary is wholly derivative of his claim against Defendant James; that is, Defendant Singletary's liability is entirely contingent on Defendant James not being exonerated on the merits. Before adjourning the March 28 Status, the Court ascertained from each party that the case was fully submitted. For the reasons stated below, Defendant James's motion for summary judgment on qualified immunity grounds is granted. Defendants James and Singletary's motion for summary judgment on the merits is granted. Plaintiff's motion for partial summary judgment is dismissed as moot.

## I. STIPULATED FACTS

Plaintiff was a probationary corrections officer at CCI. On January 18, 1993 (Martin Luther King's Day), Plaintiff and four other officers were present at an outdoor barbecue, held at the house of Corrections Officer James E. Cooke ("Cooke"). Both Plaintiff's and another officer's attire included a t-shirt adorned with a swastika and the words "White Power" ("White Power t-shirt"). At the barbecue, the officers discussed their common concern that CCI and Defendant James in particular appeared at times to be biased against white officers in terms of dis-cipline and general treatment, and criticized CCI's affirmative action program. After he became somewhat inebriated, Cooke fired off an AK–47 rifle into the air, which eventually led to a police officer arriving on the scene and arresting Cooke. Though initially exhibiting some degree of reticence when questioned by the arresting officer, Plaintiff and the other officer eventually explained to the arresting officer that they were wearing the White Power t-shirts to commemorate Martin Luther King's Day.

On January 19, 1993, Defendant James initiated an investigation of the aforementioned incident ("T–Shirt Incident"). Starting on January 21, 1993, newspaper articles were published depicting the incident; these articles discussed Cooke's firing of the rifle, Cooke's subsequent arrest, and Plaintiff and the other officers' wearing of the White Power t-shirts. The articles did not mention any conversations amongst the officers about race-related issues at CCI.

After contacting DOC's legal department and discussing the matter with his superiors, Defendant James terminated Plaintiff on January 22, 1993. The only reason for Plaintiff's termination was his involvement in the T–Shirt Incident. Two of the other officers were given 20–day suspensions, which were eventually set aside through an internal appeal procedure. The remaining two officers eventually resigned. Plaintiff was the only probationary employee among the officers involved in the T–Shirt Incident; the other four officers were permanent employees entitled to notice and a pre-deprivation hearing.

## II. STANDARD FOR RELIEF UNDER RULE 56

Rule 56(c) states in relevant part: [Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Rule 56(c) mandates an entry of summary judgment "against a party who fails to make a sufficient showing to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact.*" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). The non-moving party may not rely on bare allegations in its pleadings to avoid summary judgment; rather, it must produce the type of evidentiary material delineated in Rule 56(c) to rebut a properly supported summary judgment motion. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The non-moving party may also avoid summary judgment by showing that, even if there are no genuine, material factual disputes, the moving party is not entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

## III. DEFENDANT JAMES'S ASSERTION OF QUALIFIED IMMUNITY

■ Defendant James argues in his motion for summary judgment that he is entitled to qualified immunity as a public official, who in exercising discretionary functions, did not violate clearly established law. At the March 28 Status, Plaintiff essentially attempted to distinguish the cases cited by Defendant James in his supporting legal memorandum.

■ The qualified immunity doctrine shields a public official exercising discretionary duties from civil liability unless his or her conduct is "unreasonable in light of clearly established law." *Elder v. Holloway, et al.,* — U.S. —, —, 114 S.Ct. 1019, 1020, 127 L.Ed.2d 344 (1994). A court may grant a summary judgment motion on qualified immunity grounds where the movant-defendant establishes that there are no genuine issues of material fact relating to the implicated legal question—whether the defendant's action violated clearly established law. *Courson v. McMillian,* 939 F.2d 1479, 1486–87 (11th Cir.1991). Once properly supported, a plaintiff can avoid summary judgment on qualified immunity grounds only by showing that genuine, material factual disputes exist or that the defendant's conduct violated clearly established law. *Id.* at 1487.

■ It is within a court's purview to determine whether a government official's conduct violates constitutional or statutory law that was clearly established when the official partook in the action. *Id.* at 1487–88. The applicable law is "clearly established" if "[t]he contours of the right [is] sufficiently clear [so] that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). A defendant is entitled to qualified immunity in either of the following two situations: one, where the applicable law is not clearly established; or two, where the law is clearly established but the defendant's conduct did not violate any right accorded to the plaintiff under such established law. *Courson,* 939 F.2d at 1488 n. 14. Here, Plaintiff does not contest that Defendant James was acting within the scope of his discretionary authority when he made the decision to terminate Plaintiff. *See* Fla.Stat. ch. 944.14 (1993). Thus, if the applicable law was not clearly established, or if the law was clearly established and Defendant James did not violate that law in terminating Plaintiff, he is entitled to qualified immunity.

■ Defendant James did not violate clearly established law in terminating Plaintiff. No clear-cut standard exists to put a government employer on notice of constitutional violations in cases where a public employee brings an action alleging that the employer violated his or her First Amendment rights. *Busby v. City of Orlando,* 931 F.2d 764, 774 (11th Cir.1991). Thus, a government employer, when sued in his or her individual capacity, is entitled to qualified immunity unless a balancing of the government's interest in the effective operation of its agency against the employee's interest in commenting on matters of public concern "would lead to the inevitable conclusion that the discharge of the employee was unlawful," *Dartland v. Metropolitan Dade County,* 866

F.2d 1321, 1323 (11th Cir.1989) (referring to the balancing test enunciated in *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)); such an official is "entitled to immunity except in the extraordinary case," *Dartland*, 866 F.2d at 1323. A court need not determine precisely what the result would be under the *Pickering* balancing test in order to determine if the employer is entitled to qualified immunity. *Busby*, 931 F.2d at 774. Immunity is especially appropriate in cases where the employer's government agency is involved in quasi-military organizations such as law enforcement agencies because discipline is essential to such agencies, *id.*, and because law enforcement employees are entitled to less First Amendment protection than other government employees, *McMullen v. Carson*, 754 F.2d 936, 938 (11th Cir.1985). Correctional officers are functionally similar to law enforcement officers under Florida law. *See* Fla.Stats. chs. 943.10 & 943.13 (1993).

During the March 28 Status, Plaintiff argued that the law regarding whether Defendant James was *permitted* to fire him was not clearly established, failing to address the pertinent legal issue in this case: whether there was a clear establishment of law with regard to whether Defendant James was *prohibited* from terminating him for his exercise of First Amendment rights during the T–Shirt Incident. Even without reaching the issues of whether Plaintiff's involvement in the T–Shirt Incident constituted First Amendment expression that was a matter of public concern, *see* Part IV, *infra*, and whether the precise result under the *Pickering* balancing test favors Plaintiff, *see* Part V, *infra*, the Court holds that there was no clearly established law that Defendant James violated in terminating Plaintiff. *See Busby*, 931 F.2d at 774; *Dartland*, 866 F.2d at 1323. The only proposition that may have been legally well-founded is that Defendant James was *permitted* to terminate Plaintiff, not the converse as required for Plaintiff to meet his burden.

## IV. "PUBLIC CONCERN" REQUIREMENT

■ Defendants contend that regardless of whether Plaintiff's expression during the T–Shirt Incident was abstractly entitled to First Amendment protection, the specific legal issue here is whether the expression was a matter of public concern. Defendants argue that Plaintiff's expression was not a matter of public concern and thus they are entitled to summary judgment on the merits. Plaintiff counters that his wearing of the White Power t-shirt was symbolic speech entitled to First Amendment protection but concedes that this was at least initially a matter of purely private concern. Nevertheless, Plaintiff argues that because he and the other officers also discussed "race relations" at CCI and their perception that Defendant James favored non-white officers in terms of discipline and treatment, and because of the subsequent publicity of the T–Shirt Incident, his private First Amendment expression transmuted into a matter of public concern.

■ Plaintiff's expression is not a matter of public concern. Absent extraordinary circumstances, in cases where a government employee challenges his or her termination on First Amendment grounds, if the employee cannot demonstrate that the subject expression was a matter of public concern, the defect is fatal to the action, *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983), and the employer is entitled to summary judgment, *Pearson v. Macon–Bibb County Hosp. Auth.*, 952 F.2d 1274, 1278 (11th Cir.1992). Whether the employee's speech involves a matter of public concern is determined by considering the "content, form, and context of a given statement [or expression]." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Factors a court should use in making this determination include: whether the expression relates to "any matter of political, social, or other concern to the community," *id.* at 146, 103 S.Ct. at 1690, or merely to "matters only of personal interest," *id.* at 147, 103 S.Ct. at 1690; whether the employee attempted to have the subject of his or her expression aired in a public forum, *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir.1993); *see also Connick*, 461 U.S. at 148, 103 S.Ct. at 1690; and the motivation of the employee in making the expression, *Morgan*, 6 F.3d at 754.

The mere fact that the subject matter of the expression is one in which the public might have a substantial interest, such as issues relating to sexual harassment in a public workplace, is not dispositive. *Morgan*, 6 F.3d at 754. A court should consider the employee's motive to determine whether the employee was trying to bring such issues to the public's attention or whether the employee was merely concerned with how such issues affected his or her personal interest. *Id.* Thus, mere employee grievances, even when based on perceived unconstitutional discrimination or even where the grievance extends to the similar plight of coworkers, are not matters of public concern. *Id.* at 755. Finally, a general, purported public interest in the way government institutions operate is insufficient to meet the public concern requirement. *Pearson*, 952 F.2d at 1279.

Plaintiff here engaged in two related First Amendment activities: one, symbolically expressing his view on race-related issues by wearing the White Power t-shirt; and two, discussing his perception of racial discrimination at CCI with his peers. With regard to Plaintiff's symbolic expression, the issue is not whether wearing the White Power t-shirt is entitled to First Amendment protection in the abstract. Rather, the critical issue is whether Plaintiff's expression was a matter of public concern. The Court holds that under the test established in *Connick*, 461 U.S. at 146–47, 103 S.Ct. at 1689–90, Plaintiff's beliefs relating to the swastika and the strength or power of white people are purely matters of personal interest, not matters of public concern, *see id.* at 147, 103 S.Ct. at 1690.

Plaintiff's speech relating to the alleged race discrimination at CCI is a closer question, for such an issue does abstractly have public-concern implications. *See Morgan*, 6 F.3d at 754. The countervailing, determinative factor here is that there is no indication in the record that Plaintiff's motivation in discussing the alleged race discrimination was to bring the issue to the public's attention. Plaintiff argues that regardless of the motivation behind the initial private nature of their discussion, once the media published

articles relating to the T–Shirt Incident, the issue was brought to the public's attention.

There are two palpable flaws in Plaintiff's argument. First, the media attention was completely serendipitous. Plaintiff does not claim and there is nothing in the record to indicate that the media attention was sought or desired; thus, there is no support for a contention that Plaintiff's motivation in discussing the alleged discrimination at CCI with his coworkers was anything beyond the mutual airing of personal employee grievances. Second, the focus of the media attention was purely on the firing of the rifle, the subsequent arrest of Cooke and the wearing of the White Power t-shirts; there is no mention of Plaintiff's perception of race discrimination at CCI in any of the articles in the record. (Amended Complaint, Docket Entry # 9, Exhibit A). Thus, there is no indication in Plaintiff's' submissions that the issue of race discrimination at CCI was ever publicly aired, which is an important factor in *deciding* whether a particular First Amendment expression was, or was meant to be, a matter of public concern, *Morgan*, 6 F.3d at 754.

Under the standards enunciated in *Morgan*, 6 F.3d at 754–55, the Court holds that Plaintiff's speech relating to the alleged discriminatory treatment accorded to white officers at CCI was not a matter of public concern. Furthermore, Plaintiff does not argue and the Court does not find that this case presents extraordinary circumstances, *see Connick*, 461 U.S. at 147, 103 S.Ct. at 1690, abrogating the public concern requirement.

## V. *PICKERING* BALANCING TEST

Even assuming that Plaintiff's First Amendment expression was a matter of public concern, Plaintiff still needs to prevail under the balancing test established in *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Defendants argue that CCI's interest in operating effectively was jeopardized by Plaintiff's involvement in the T–Shirt Incident and the resulting publicity. Plaintiff essentially argues that Defendants' concern that CCI's operations would be adversely affected by

Plaintiff's involvement was pure conjecture and thus did not justify his termination.

Although public employees are still accorded some First Amendment protection when commenting on matters of public concern, the scope of such protection is determined by "balanc[ing] [ ] the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. In a case that closely parallels the facts in this case, *McMullen v. Carson*, 754 F.2d 936 (11th Cir.1985), a clerical employee in a law enforcement office was terminated after his membership in the Ku Klux Klan ("KKK") was brought to the public's attention, *id.* at 936–37. The district court dismissed the employee's First Amendment § 1983 action after making findings regarding the perceived violent nature of the KKK and the racial tension that arose in the community as a result of the disclosure of membership in the group, *id.* at 937; in reviewing the lower court's dismissal, the Eleventh Circuit highlighted these same factors, *id.* at 938. The *McMullen* plaintiff produced no evidence to contradict the employer's submissions that the community would have serious misgivings about a government agency that retained an employee who is a member of the KKK; the plaintiff instead relied primarily on his constitutionally-protected interest in being associated with the KKK to support his case. *Id.* at 939.

The employee further argued that the employer improvidently terminated him without gauging whether the public would actually react with disfavor to his KKK membership. The employer argued that relying on his many years of experience with the law enforcement office, he was convinced that such public reaction was certain and imminent. *McMullen*, 754 F.2d at 939. The *McMullen* court rejected the employee's argument, stating that "there is no 'necessity for an employer to allow events to unfold to the extent that the disruption of the office and destruction of working relationships is manifest before taking action.'" *Id.* (quoting *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692). Finally, the court noted that where a law enforcement agency is involved, the agency's employee is entitled to less First Amendment protection than in other contexts, and that a lesser showing on the part of the agency is required where the employee's expression only tangentially related to a matter of public concern. *Id.* at 939–40. Based on these considerations, the court held that the district court properly dismissed the employee's § 1983 action. *Id.* at 940.

In this case, Defendant James claims he decided to discipline all five officers based on the following considerations: that the T–Shirt Incident generated unwanted media attention; that CCI staff members were questioned by the public about the nature of CCI in light of the incident; that CCI is a "close management" institution, the second highest classification in the Florida state system, and houses some of the most violent inmates in the DOC prison system; that 60–65% of the CCI inmates were African–American; that there is a history of physical confrontations between inmates and CCI staff members, with many of these assaults crossing racial lines (i.e., African–American inmates assaulting white officers and vice versa); that African–American inmates had in the past expressed concern over the apparent racial animus of some white correctional officers, claiming that some white officers used excessive force in handling African–American inmates; and that interviews with some inmates after media publication of the T–Shirt Incident indicated that they had developed animosity towards the five officers involved. (Defendant James's Declaration, Docket Entry # 31, 3–6).

Defendant James's decision to terminate Plaintiff, who as a probationary employee did not have an entitlement to notice and a pre-deprivation hearing, was motivated by the following considerations: Plaintiff's conduct during the T–Shirt Incident showed poor judgment, especially in terms of his belligerent attitude towards the arresting law enforcement official; the T–Shirt Incident created a potentially dangerous situation by increasing the prevalent racial tensions at CCI; Plaintiff's involvement in the incident put

him at risk of sustaining injuries from hostile, violent inmates; and Plaintiff's utility to CCI was dramatically decreased by his inability to serve in a custodial position requiring direct contact with inmates. *Id.* at 7.

In support of his First Amendment interests for purposes of the *Pickering* balancing test, Plaintiff relies on the allegations in his Amended Complaint, (Amended Complaint, Docket Entry # 9), and his verbal representations made during the March 28 Status that Defendant James conducted no particular inquiry—in the form of interviews or otherwise—regarding the T–Shirt Incident before terminating him. The Court finds that Plaintiff's inadequate response to Defendants' motion for summary judgment on the merits, supported by Defendant James's affidavit, (Defendant James's Declaration, Docket Entry # 31), falls short of creating genuine issues of material fact. Thus, to avoid summary judgment, Plaintiff must establish that Defendants are not entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

The *Pickering* balance tilts strongly in favor of Defendants' interest in the effective operation of CCI, superseding Plaintiff's First Amendment interests in this case. Acting similarly to the defendant in *McMullen,* 754 F.2d at 937–38, Defendant James here: relied on his own experiences within the prison system; acknowledged the potential adverse reaction that may arise from the perceived association of a CCI officer with the extremist beliefs symbolized by the White Power t-shirt; and conducted a detailed investigation of the effect that the publicity relating to the T–Shirt Incident was having and could potentially have on the effective operation of CCI. (Defendant James's Declaration, 3–6). Defendant James did not have to wait until racial tensions erupted before taking action. *See Connick,* 461 U.S. at 152, 103 S.Ct. at 1692; *McMullen,* 754 F.2d at 939.

Like the *McMullen* plaintiff, 754 F.2d at 939, Plaintiff here has not produced the type of evidence required by Rule 56(c) to contradict Defendant James's portentous conclusions. Finally, even under the assumption that Plaintiff's First Amendment expression was not purely a private matter, it was only tangentially a matter of public concern, expressed by someone occupying a position similar to a law enforcement official; thus, Plaintiff's interests are entitled to less protection than in other contexts. *See Id.* at 939–40. Taking all these factors into consideration, the Court holds that the *Pickering* balance strongly favors Defendants and thus Plaintiff has failed to meet his alternative burden of demonstrating that Defendants are not entitled to judgment as a matter of law.

## VI. CONCLUSION

Defendant James is entitled to qualified immunity because he did not violate clearly established law in terminating Plaintiff. Thus, Defendant James's motion for summary judgment on immunity grounds is granted.

On the merits, the Court holds that Plaintiff's First Amendment expression was not a matter of public concern. Even if Plaintiff's expression could be characterized as such, the *Pickering* balancing test yields a result strongly in favor of Defendants' superseding interest in the effective operation of CCI. Thus, Defendants James and Singletary are entitled to summary judgment on the merits. Given this result, Plaintiff's motion for partial summary judgment on the substantial or motivating factor issue is dismissed as moot.

So Ordered.